IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| WILLIE ARTHUR JACKSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:11CV728-SRW |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Willie Arthur Jackson brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying his applications for a period of disability and disability insurance benefits and for supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). (Doc. ## 7, 8). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff protectively filed the present applications on April 8, 2009, alleging that he became disabled on March 18, 2009, due to problems with his back, knees, and right shoulder, high cholesterol, high blood pressure, and abnormal colon. (Exhibits 2D, 3D, R.

166).[1]  After plaintiff's claims were denied initially and upon reconsideration, plaintiff requested a hearing before an ALJ, which was held on December 8, 2010.  (Exhibits 1A-4A, 1B, 3B-11B, R. 31-50).  The ALJ issued a decision on February 22, 2011, concluding that plaintiff had severe impairments of "degenerative joint disease and lumbago/back pain with osteophyte formation at S1, L4 and L5," but that he did not have an impairment or combination of impairments that met or medically equaled a listing.  (R. 20-21).  The ALJ found that plaintiff retained the residual functional capacity to perform the exertional requirements of medium work, with additional non-exertional restrictions.  (R. 21).  The ALJ determined that, plaintiff's RFC did not preclude performance of his past relevant work "as an assembly line worker and janitor as actually and generally performed (R. 25-26) and, therefore, that plaintiff was not under a disability from his alleged onset date through the date of the ALJ's decision (R. 26).  The Appeals Council denied plaintiff's request for review of the ALJ's decision (R. 6-13), and plaintiff commenced the present action thereafter.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed.  The court does not reweigh the evidence or substitute its judgment for that of the Commissioner.  Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings.  Davis v.

---

[1] Plaintiff indicated that he stopped working on March 18, 2009, because the chicken processing plant at which he worked "closed down."  (R. 166-67).

Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991).  Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145.  Factual findings that are supported by substantial evidence must be upheld by the court.  The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied.  Davis, 985 F.2d at 531.  If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed.  Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Plaintiff's Medical Treatment and Evaluation

Plaintiff was evaluated by Dr. McArthur Cadet of the VA on January 21, 2009;[2] he presented with complaints of hypertension, a long history of chronic back pain, knee pain "for many years worse with activity and treated only with [over the counter] meds," and right upper arm swelling "for about 20 yrs and some change in size[.]" (R. 251).  He complained of pain at a level of "9." (R. 252, 256).  Aside from a "firm large 3.5-4 cm sq nodule" on plaintiff's right shoulder, Dr. Cadet noted no abnormalities on physical examination. (R. 252-253).  Dr. Cadet assessed, as to plaintiff's musculoskeletal complaints: (1) "right upper

---

[2] He was treated at the emergency room the previous month for hypertension, with complaints of feeling his heart racing and having a headache when his blood pressure is high. He reported that he had not been on medications for approximately one year. His diagnosis upon discharge was "[h]igh blood pressure." (R. 262-71).

arm lump for yrs[,]" for which he ordered xrays to rule out "bony involvement"; (2) chronic knee pain, for which he prescribed "ice/heat/knee braces with trial on sulindac"; and (3) "chronic [low back pain] for yrs[,]" for which he ordered a physical therapy consult with a lumbar spine series and "trial of sundilac[.]" (R. 253-54). Plaintiff reported that he had not fallen within the previous twelve months. (R. 261). The xray of plaintiff's right shoulder was negative (R. 273); his lumbar spine xray showed "[p]rominent anteria osteophyte involving the superiof endplate of S1 with likely tiny osteophytes beginning to form at the superior endplate of L4 and L5, otherwise negative lumbar spine" (R. 274). Plaintiff was fitted for, and received, knee braces for both knees at 1:20 p.m. on March 12, 2009 in the Prosthetic/Orthotic Lab, but failed to show up for or reschedule his appointment for a consultation with physical therapy for later that same afternoon. (R. 246-47). Plaintiff returned to see Dr. Cadet on May 6, 2009; he complained of a pain level of "10" and reported "2 or more" falls within the past twelve months, with no injury or treatment, when his "knees and back gave out[.]" (R. 243-46). Dr. Cadet noted that plaintiff "did not go to physical therapy as scheduled and has not always taken bp med." (R. 240). Dr. Cadet recorded no abnormal findings on physical examination. For plaintiff's left knee pain, he ordered "routine xrays with physical therapy as scheduled and continue nsaid[.]" (R. 241).[3] He referred plaintiff to general surgery for "possible excision" of his "right proximal humeral soft tissue growth." (Id.). When plaintiff returned to the clinic two weeks later to see the nurse for a

---

[3] Sulindac is an NSAID. *Physician's Desk Reference* (65th ed. 2011) at pp. 1993-97.

blood pressure check, he reported "full compliance with meds and exercise goals," partial compliance with a low sodium diet, and a pain level of "1." (R. 238). Plaintiff's surgery consultation was on June 1, 2009. He reported pain "off and on" and, at that time, at a level of "0." (R. 237). Plaintiff told Dr. Miller that his right arm mass had been present for thirty years and "[o]nly recently did he notice it to get larger and start causing some discomfort." (R. 236). Dr. Miller assessed a "firm, non-mobile right upper arm mass." She ordered a CT scan to assess the mass, and planned for plaintiff to return to the clinic after the CT scan. (Id.). The CT scan showed a "2.8 x 2.5 cm intramuscular lipoma" ("fatty mass"), but "[n]o significant degenerative change ... within the right glenohumeral joint or acromioclavicular joint." (R. 272).[4]

    Plaintiff reported to Dr. Latasha Burgess on August 13, 2009, for a consultative physical examination. Plaintiff reported bilateral knee pain for more than fifteen years, resulting in "crepitation and unstable gait." He "denie[d] locking/popping/giving away, swelling, and sensation of instability." Dr. Burgess noted that "[l]imited medical records from the VA hospital are available from their East Point Clinic. The records indicate that patient did not go to his physical therapy appointments as scheduled." Plaintiff complained of severe pain in his mid-lumbar spine, with "some pain relief with NSAIDs." He reported "essentially constant pain," with "the current episode of pain start[ing] more than 15 years ago[,]" and "stiffness and numbness in butto[]cks and flank area." Plaintiff reported

---

[4] There is no record of a return visit to Dr. Miller after the CT scan.

"intermittent and sharp" pain deep in his right shoulder that "initially started more than 10 years ago" with numbness over the shoulder, and that the pain is relieved with NSAIDs. (R. 287). Dr. Burgess noted no abnormalities on examination of plaintiff's back and knees. Straight leg raise, anterior drawer and posterior drawer were all negative. Dr. Burgess noted the palpable non-tender soft tissue mass on plaintiff's right shoulder and elicited pain on palpation of the shoulder anteriorly and deltoid. She noted a limited passive range of motion of the right shoulder "with extension (to 120 degrees) and abduction." Dr. Burgess observed that plaintiff was "[a]ble to stand from chair and sit on table without difficulty and unaided[.]" (R. 288-89). Dr. Burgess reported a normal Xray of plaintiff's shoulder and Xrays of both knees showing "mild narrowing of the medial joint space[.]" (R. 289; see also R. 284-86 (xray reports). She reported normal strength and range of motion in plaintiff's upper and lower extremities, both proximal and distal, except for "[m]ild weakness" and "mild limitation on range of motion" in plaintiff's right upper arm. (R. 282; R. 280-83 (detailed "all systems" report of plaintiff's musculoskeletal range of motion completed by Dr. Burgess). Dr. Burgess observed that plaintiff "has a normal gait and is able to ambulate without assistance. Mr. Jackson is able to stand from a seated position without difficulty. She concluded:

> Mr. Willie Jackson has been evaluated for his complaints of back pain, right shoulder pain and knee pain. On examination of the patient, no significant deformities or neurological impairments were found. Mr. Jackson is able to sit, stand, and walk. Mr. Jackson states in his history that he has severe pain affecting his back, knees, and right shoulder. However, on examination of these body parts he reported only mild pain affecting his right shoulder. Mr.

6

> Jackson had a normal xray of the right shoulder and xray of the left knee and right knee revealed changes suggestive of mild degenerative changes. It has been noted in records from the VA hospital that Mr. Jackson did not keep his appointment to that physical therapy for his knee pain. I recommend that Mr. Willie Jackson returns to his primary providers at the VA Hospital to start physical therapy to treat his mild degenerative joint disease affecting his knees as well as for his back pain.

(R. 289). She assessed low back pain, knee pain and shoulder pain. (Id.)

Plaintiff next returned to the VA for treatment on April 21, 2010, nearly eight months after the consultative examination by Dr. Burgess and almost a year after his most recent office visit with a physician at the VA primary care clinic.[5] On this occasion, plaintiff saw "Medicine Resident" Anju Oommen. (R. 316-27). Plaintiff reported pain at level "8" to the intake nurse (R. 323) and reported back pain at "9/10" to Dr. Oommen (R. 317). He complained of losing balance and falling down "when knee gives way[,]" reporting that this occurred once every two to three months. He further complained of "constant knee pain increasing with walking and bending." He complained of "back pain 9/10[,] increased with bending" and that he "takes sulindac and pain is relieved." He further reported numbness around his hip when he lifts his hand. (Id.). On physical examination, Dr. Oommen noted no abnormalities other than the mass on plaintiff's right shoulder and crepitus in plaintiff's left knee, with his left knee extension "limited by pain." Straight leg raising, drawers and collateral ligament tests were all negative. (R. 318). Dr. Oommen noted that plaintiff's knee

---

[5] As noted above, plaintiff saw Dr. Cadet on May 6, 2009, had his blood pressure checked by a nurse on May 21, 2009, and had a consultation with Dr. Miller at the VA general surgery clinic regarding the mass on his shoulder on June 1, 2009. See Plaintiff's evidentiary summary (Doc. # 16-1, pp. 3-10)

pain was "most likely secondary to OA." He continued plaintiff on sulindac "PRN," indicated that he would order bilateral knee xrays, referred plaintiff to physical therapy "for supportive equipment." Dr. Oommen planned to "consult ortho once xrays are reported." He noted the result of plaintiff's back xray from the previous year and referred plaintiff to physical therapy for low back pain exercise. As to the lipoma on plaintiff's right arm, he noted, "pt to call and schedule surgery with outside surgeon." (Id.). VA Staff Physician Leah Jones "reviewed the history with the resident and ... performed key portions of the physical exam." She indicated that plaintiff's range of motion in his left knee was limited secondary to pain and tender to palpation, but anterior drawer test was negative, and she observed no effusion and no joint/tendon laxity. Dr. Jones indicated her agreement with the resident's note, including his assessment and plan. (R. 322).[6] One week later, Dr. Jones advised plaintiff of the Xray results by letter. She stated, "Your knee xray shows mild arthritis. Please be sure to see the physical therapists to assist with strengthening." Dr. Jones advised plaintiff to call if he had any questions (R. 311-12). Plaintiff saw a nurse at the clinic for a blood pressure check on May 12, 2010. (R. 310-11).

On June 10, 2010, plaintiff reported to the VA physical therapy clinic for a consult. Plaintiff complained of back and knee pain, that his knee braces did not help, that his left

---

[6] Although LPN Bristol notified Dr. Jones of plaintiff's positive "depression screen" upon intake (R. 324-28) and Dr. Oomman recorded plaintiff's complaints of low energy, minimal interest, mood swings, and worry about his "current unemployment situation" (R. 317), neither Dr. Oomman nor Dr. Jones assessed any mental health impairment or referred plaintiff for mental health evaluation. (See R. 316-22).

pain was "most likely secondary to OA." He continued plaintiff on sulindac "PRN," indicated that he would order bilateral knee xrays, referred plaintiff to physical therapy "for supportive equipment." Dr. Oommen planned to "consult ortho once xrays are reported." He noted the result of plaintiff's back xray from the previous year and referred plaintiff to physical therapy for low back pain exercise. As to the lipoma on plaintiff's right arm, he noted, "pt to call and schedule surgery with outside surgeon." (Id.). VA Staff Physician Leah Jones "reviewed the history with the resident and ... performed key portions of the physical exam." She indicated that plaintiff's range of motion in his left knee was limited secondary to pain and tender to palpation, but anterior drawer test was negative, and she observed no effusion and no joint/tendon laxity. Dr. Jones indicated her agreement with the resident's note, including his assessment and plan. (R. 322).[6] One week later, Dr. Jones advised plaintiff of the Xray results by letter. She stated, "Your knee xray shows mild arthritis. Please be sure to see the physical therapists to assist with strengthening." Dr. Jones advised plaintiff to call if he had any questions (R. 311-12). Plaintiff saw a nurse at the clinic for a blood pressure check on May 12, 2010. (R. 310-11).

On June 10, 2010, plaintiff reported to the VA physical therapy clinic for a consult. Plaintiff complained of back and knee pain, that his knee braces did not help, that his left

---

[6] Although LPN Bristol notified Dr. Jones of plaintiff's positive "depression screen" upon intake (R. 324-28) and Dr. Oomman recorded plaintiff's complaints of low energy, minimal interest, mood swings, and worry about his "current unemployment situation" (R. 317), neither Dr. Oomman nor Dr. Jones assessed any mental health impairment or referred plaintiff for mental health evaluation. (See R. 316-22).

knee "won't hold up" and that he had fallen "about 8 times." (R. 334). He complained of "8/10 back pain; 10/10 left knee pain and 6/10 right knee pain." The physical therapist observed, "Veteran has fair-strength of left knee extension and poor strength of right knee extension with marked pain upon terminal extension. All other motions of lower extremities with functional strength. Noted tenderness lateral surfaces of both knees. No edema noted upon palpation of knees." (Id.). She noted that "[l]umbosacral pain elicited upon movement of trunk" and tenderness in plaintiff's lumbosacral region, but no muscle spasm or edema. (R. 334-35). The physical therapist instructed plaintiff on a home exercise program including knee strengthening exercises and back flexion exercises, and in ambulation with a cane. She issued him a cane, a lumbar roll to improve his posture, and ordered a heating pad for him. (Id.). She scheduled plaintiff for a July 8, 2010, physical therapy appointment "for re-assessment for progression of home exercise program." (R. 335). However, the physical therapist entered a note in plaintiff's medical record on July 8, 2010 that "Veteran did not show nor call to re-schedule follow-up PT appt" and that she planned to discontinue physical therapy "if veteran does not call to re-schedule." (R. 336).[7]

### The Weight Accorded to Medical Opinions

The ALJ gave "substantial weight to Dr. Burgess assessment that reflects the

---

[7] The transcript includes no record of further physical therapy or medical treatment between the June 2010 physical therapy evaluation and the ALJ's February 22, 2011 decision. See generally Plaintiff's summary at Doc. # 16-1. Plaintiff's summary – although somewhat one-sided (it omits any reference to plaintiff's July 8, 2010, no-show for physical therapy, for instance, and other significant negative findings) – is useful for a chronology of plaintiff's treatment.

claimant's ability to sit, stand, and walk should not really be impaired." (R. 24). He noted that "[h]er opinion is well supported by her own clinical examinations and testing ... and is generally consistent with the record as a whole." The ALJ also gave significant weight to the RFC opinion rendered by non-examining physician Dr. Robert H. Heilpern on January 6, 2010 (Exhibit 6F) and to that rendered by non-examining physician Dr. Harold Sours on September 11, 2009 (Exhibit 4F). As to both of these, the ALJ noted that the physicians had given specific reasons for their RFC opinions that were "grounded in the evidence of record." (R. 24, 25). He further noted that he had limited plaintiff to never climbing ladders, ropes or scaffolds and never crawling based on evidence received in the record at the hearing level, but that the additional evidence "did not provide any new or material information that would <u>significantly</u> alter findings about the claimant's functional limitations" given by Dr. Sours or Dr. Heilpern. (R. 25)(emphasis in original).

     Plaintiff argues that "the ALJ lacks good cause for rejecting the doctors from the Veteran[]s Administration that prescribed Mr. Jackson knee braces and a cane based on the report of a one time examining physician and two non-examining physicians. (Doc. # 10, p. 11). As the medical record makes clear, Dr. Cadet prescribed the knee braces the first time he evaluated the plaintiff. (R. 251-54). Similarly, when plaintiff returned to the VA in April 2010 – nearly a year after his most recent previous visit to Dr. Cadet for his complaints of back and knee pain – medical resident Dr. Oommen referred plaintiff to physical therapy for "supportive equipment" at Dr. Oommen's first (and only) evaluation of the plaintiff. The

treatment plan was confirmed by staff physician Dr. Jones, who also had never before evaluated the plaintiff. The ALJ considered plaintiff's treatment record from the VA, noting both the knee braces and the cane. He observed, correctly, that plaintiff's April 2010 knee Xrays showed only mild degenerative changes and that plaintiff did not follow through with physical therapy prescribed for pain relief. (R. 23).[8] The court finds no error in the ALJ's treatment of the medical opinions of record and concludes that the ALJ's RFC finding is supported by substantial evidence.[9]

## The ALJ's Step Four Finding

A claimant who retains the residual functional capacity to perform his past relevant work – either as he actually performed that work or as it is generally performed in the national economy – is not disabled. 20 C.F.R. §§ 404.1520(f), 404.1560(b)(2), 416.920(f), 416.960(b)(2); SSR 82-61. Plaintiff contends that the ALJ erred in concluding that he could return to his past relevant work. (Doc. # 10, pp. 1, 5-11; See ALJ's Finding No. 6, R. 25).

---

[8] As set forth above, the medical record demonstrates that plaintiff went to the orthotics lab for his knee braces but failed to appear for his physical therapy appointment scheduled the same afternoon. A year later, after the initial visit to physical therapy in which he received a cane, plaintiff failed to appear for his scheduled return visit.

[9] Plaintiff argues that the ALJ rejected the "doctors ... that prescribed knee braces and a cane." (Doc. # 10, p. 11). His apparent contention is that the physicians' prescriptions for supportive devices for plaintiff's complaints of back and knee pain implies a medical opinion of plaintiff's continuing need for the devices for a duration sufficient to require that their use be included in plaintiff's RFC or, alternatively, that they imply an opinion regarding the credibility of plaintiff's subjective complaints of pain. To the extent that plaintiff means to argue the latter, the court finds that the ALJ's credibility determination as to plaintiff's pain complaints is adequate and supported by substantial evidence. To the extent that plaintiff means to argue the former, the court finds no evidence in the VA medical record that suggests such an implied opinion.

The ALJ found that plaintiff is limited to "medium work" exertionally, with additional limitations including, *inter alia*, that he "should never climb ladders, ropes or scaffolds[.]" (R. 21). Citing the vocational expert's testimony at the administrative hearing, the ALJ concluded that plaintiff's residual functional capacity did not preclude the performance of plaintiff's past relevant work as an assembly line worker or as a janitor, either as plaintiff actually performed that work or as it is generally performed. (R. 25-26).

The VE characterized plaintiff's past work as a "janitor" by reference to DOT # 318.687-018. (R. 45). Plaintiff points out that this DOT classification describes the work of a "silver wrapper" and argues that he has never performed this work. (Doc. # 10, p. 10). The Commissioner does not dispute plaintiff's contention that he has never worked as a "silver wrapper," or that DOT # 3<u>18</u>.687-018 describes that job. The Commissioner notes, however, that the DOT number in the hearing transcript appears to be transposed, as the classification at DOT # 3<u>81</u>.687-018 describes the job of janitor. (Doc. # 13, at p. 11 and n. 2). Plaintiff argues on the very next page of his brief that a "possible alternative job would be an industrial cleaner, DOT# 381.687-018[.]" (Doc. # 10, p. 11), suggesting that his "silver cleaner" argument is a red herring. Since the VE identified the job by the title of "janitor," the court concludes that the VE either did or intended to refer to the latter classification number for industrial cleaner.[10]

---

[10] The DOT classification for industrial cleaner lists alternate titles for the job, including "Janitor." Department of Labor, *Dictionary of Occupational Titles* (4th ed. 1991) at DOT # 381.687-018.

Plaintiff argues that the RFC limitation to "never" climbing ladders rules out the janitorial work that plaintiff performed, since plaintiff reported that his job required that he climb for about four hours each day and "[i]t seems reasonable to assume that a janitor would need to climb ladders to perform such tasks as changing light bulbs." (Doc. # 10, pp. 10-11 (citing work history report); see Exhibits 3E, 5E, 14E). Plaintiff further contends that the industrial cleaner job described in DOT #381.687-018 is precluded by the same limitation, as it "also requires occasional climbing." (Id., p. 11). The Commissioner responds that the vocational expert's testimony that plaintiff could perform this work, in response to the ALJ's hypothetical question including all of the limitations in his RFC finding, supports the ALJ's conclusion. (Doc. # 13, p. 11)(citing R. 47 and 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2)). She further observes that "the ALJ found no restriction in Plaintiff's ability to climb ramps and stairs." (Id.).

In response to the ALJ's hypothetical question – which, as the Commissioner argues, included all of the RFC limitations the ALJ found to exist (see R. 21, 46) – the VE testified as follows:

> It would allow for the assembly line job. And it would, it would allow for the janitor job. And that's it. I'm, I'm keeping the – just that one job, forklift operator, warehouse worker was combined. I think keeping those together it, it would be the demands of the warehouse worker, which requires ladders and those type of things.

(R. 47). As plaintiff argues, the DOT classification identified by the VE for the "janitor" job indicates that the job requires "occasional" climbing. It does not, however, specify the nature

13

of such climbing.  See DOT # 381.687-018.  The vocational expert testified that the hypothetical individual limited as set forth in the ALJ's RFC finding could perform that past work.  As is evident from the testimony set forth above, the VE considered the effect of the limitation to "no climbing ladders, ropes and scaffolds," as he ruled out the combined job due to the "ladders and those type of things" required for warehouse workers.  (R. 46-47).  Thus, the vocational expert's testimony provides substantial evidentiary support for the ALJ's conclusion that plaintiff's RFC does not preclude him from performing his past relevant work as a janitor, as that work is performed generally.[11]  See Jones v. Commissioner of Social Security, 423 Fed. Appx. 936 (11th Cir. 2011)(discussing ALJ's consideration of VE testimony and DOT).

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law.  Accordingly, the decision is due to be AFFIRMED.  A separate judgment will be entered.

DONE, this 10th day of September, 2013.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

[11] For this reason, the court need not: (1) determine whether the record supports the ALJ's conclusion that plaintiff can perform that job as he actually performed it; or (2) reach the issues raised by plaintiff as to the "utility worker/line assembly" job.  See 20 C.F.R. §§ 404.1520(f), 404.1560(b)(2), 416.920(f), 416.960(b)(2); SSR 82-61.